```
 1                IN THE UNITED STATES DISTRICT COURT
                  FOR THE WESTERN DISTRICT OF TEXAS
 2                        SAN ANTONIO DIVISION

 3
    UNITED STATES OF AMERICA,       .
 4                                  .
         vs.                        . DOCKET NO. 5:17-CR-031-XR
 5                                  .
    MICHAEL J. BADGETT,             .
 6                                  .
                  DEFENDANT.        .
 7

 8

 9            TRANSCRIPT OF SENTENCING PROCEEDINGS
            BEFORE THE HONORABLE XAVIER RODRIGUEZ
10                UNITED STATES DISTRICT JUDGE
                       JANUARY 10, 2018
11

12

13

14

15

16  APPEARANCES:
    FOR THE PLAINTIFF:      DANIEL P. BUTLER, ESQ.
17                          ASSISTANT UNITED STATES ATTORNEY

18
    FOR THE DEFENDANT:      MARINA THAIS DOUENAT, ESQ.
19                          OFFICE OF FEDERAL PUBLIC DEFENDER

20

21

22

23  REPORTED BY:            GIGI SIMCOX, RMR, CRR
                            OFFICIAL COURT REPORTER
24                          UNITED STATES DISTRICT COURT
                            SAN ANTONIO, TEXAS
25
```

*(San Antonio, Texas; January 10, 2018, at 1:30 p.m., in open court.)*

THE COURT: 17CR31, United States versus Michael Badgett.

MR. BUTLER: Good afternoon. Daniel Butler for the United States, your Honor.

MS. DOUENAT: Good afternoon, your Honor. Marina Douenat for Mr. Badgett.

THE COURT: Mr. Badgett, in this willful failure to file tax returns on three different counts, the Court finds that you're at a Criminal History Category I and a total offense level of 21. Statutorily for each of these three misdemeanors the statutory provision is one year, so the guideline provision effectively becomes no more than 36 months. There is a pending government motion in this case, and, with that, I'll turn to allocution.

MS. DOUENAT: Yes, your Honor. Can we just correct one thing in the PSR? His child support payments are $1,106 per month, and I have the supporting documents which I showed Mr. Butler and I'd like to tender to the court.

THE COURT: One second while I get to that page. Is that Page 11 you're on?

MR. BUTLER: Yes.

MS. DOUENAT: Yes, your Honor.

THE COURT: What do you think it is?

```
 1              MS. DOUENAT:  Per the court's order in the payments,
 2  it's 1,106 per month.  If I may approach, your Honor.
 3              THE COURT:  Yes.  So that's how much the Attorney
 4  General is withholding, so we'll make that change on Page 11.
 5              MS. DOUENAT:  Thank you, your Honor.
 6              THE COURT:  Anything by way of allocution?
 7              MS. DOUENAT:  Yes, your Honor.
 8       Would you like to hear from the government first or
 9  from us first?
10              THE COURT:  Well, yeah, I've read the government's
11  motion.  I guess I'm troubled here a little bit by, one, I'm
12  wondering now what caused the state to increase his child
13  support.  Is there more money out there than what the PSR
14  reflects?  Two, I guess I'm surprised by the public defender
15  here, considering how much money he used to have, what
16  happened to it all.
17              MS. DOUENAT:  Well, I do have an answer.  It's part
18  of my allocution, your Honor.  So let me start by explaining
19  why I believe a sentence of probation is apropos in this
20  particular case, and one of the reasons is the history and
21  characteristics of Mr. Badgett.
22       So from 2002 to 2005 Mr. Badgett worked in Dubai as a
23  salesperson for the oil field.  He would sell oil field
24  equipment for Rexel.  Then he started working in Afghanistan
25  for a company called GST where he was selling uniforms to
```

1  DynCorp for DynCorp, and in 2006 he met a Russian immigrant
2  who was an American citizen from Boston, his name is Neil
3  Emilfarb, who was wealthy because of a business he had made a
4  huge success in Boston and now was in Afghanistan building
5  compounds for DynCorp.  That's how they met.
6          While Mr. Badgett has always been a blue collar
7  worker, he has a high school education with some criminal
8  justice degree credits from college.  He doesn't have any
9  skilled day -- you know, he's not a stockbroker.  He is not an
10 accountant.  He have doesn't have any skills in that capacity,
11 but he is a hard worker.
12         And Neil, who had a lot of money, invested in
13 building Green Village, which is where, because of
14 Mr. Badgett's contacts with DynCorp and American contracts, he
15 was hired to run Green Village because of his contacts of
16 American companies that he knew.  So Green Village is a secure
17 facility where people could go and have a hot meal, a bed,
18 their laundry serviced, and they could work in Afghanistan,
19 which is a very dangerous place, but feel secure.  It's a
20 secured village.
21         He ran this working more than 50-, 60-hour days, and
22 it started making money.  And because he was one of the people
23 who started working with Neil Emilfarb, part of his cut was
24 going to be a great one when they started making money.  And
25 he did.  So he made some money in 2010, 2011.  In 2011, there

1  was a falling out with Mr. Neil Emilfarb and he left in March
2  of 2011 and came back to the United States.
3          He came back to the United States and started working
4  for himself as a day trader.  The reason I say day trader, he
5  never filed paperwork to be a day trader.  He doesn't have a
6  background to be a day trader.  So those losses, they don't
7  count for income tax purposes.
8          But he did sit at home and would trade 35 to 40 -- on
9  Ameritrade, would trade his stocks and bonds, and he lost a
10 ton of money.  He lost a ton of money that he couldn't pay for
11 the loans for his ranch.  He lost a ton of money that he -- he
12 lost a Corvette.  He lost his condo.  He pretty much lost
13 everything, and in 2014 he started worked for Lupe Tortilla.
14         So he never got paid also the -- when he severed from
15 Green Village Emilfarb was going to pay him 16 -- I think it's
16 $16 million, and he never got that money.  He never saw that
17 money.  He still owes him that money.
18         So in 2014 he was approached by SIGAR agents and the
19 IRS and he started talking to them.  In 2015 counsel was
20 appointed, and the Court knows what happens after 2015 with
21 Mr. Badgett.  But during 2011 when he came back to the United
22 States in March till 2014, before he started working as a chef
23 at Lupe Tortilla, making $65,000 a month, he lost a ton of
24 money that he had made while working in Afghanistan in day
25 trading because he's a horrible stockbroker.

And, your Honor, what we would argue is, if you look at what he's done, the exceptional things that he has done to try to remedy the harm that he's made to the government, he filed all his income taxes. They all have been filed. He hired an accountant to put together everything for 2010, '11, and '12. He also filed his '13, '14, and '15, and '16 taxes. They withheld the refund in the 2014, '15, and '16 taxes, so that amounts to about $8,000 that the IRS has been paid already on that.

The 2017 taxes refund would be about $4,600. That's what it's estimated, so that will also be held by the IRS. So that would be an additional almost $5,000 that will be held by the IRS that will be paying into the restitution amount that he owes the IRS.

He lost his wife. They got divorced in 2016. He pretty much has lost a lot. He's been punished quite a bit. But that didn't deter him from trying to help, and help himself in the process, but also try to remedy the harm by doing everything he could in his power to assist the government when they wanted him to.

So he's met with them on several occasions. He's done everything in his effort to do what he's been asked to do. And for those reasons, your Honor, we're asking for the Court to consider probation, that he has suffered a lot. He's going to pay for the rest of his life. He's going to owe for

1  the rest of his life.
2         And he does have three children, that even though two
3  of them are of the age of majority, one of them is still at
4  Texas A&M, and the other one is deaf, so he will be supporting
5  them as well.  His 17-year-old son -- or 15-year-old-son is
6  the one that he pays child support for, and he's got three
7  more years of that.  He also pays for alimony through a
8  divorce decree to his wife, and he's going to be paying that
9  for ten years unless she gets married beforehand, but she
10 hasn't been married since.  He had a 25-year marriage and the
11 stress of all of this caused that problem too.
12        So his history and characteristics, the efforts he's
13 put in to assisting the government, we're asking for a
14 probationary sentence, your Honor.  But as far as the Court's
15 concern, what happened to this money, he lost a lot of it.
16        THE COURT:  So we went from millions to losing
17 millions in day trading?
18        MS. DOUENAT:  The government is aware of his losses
19 on Ameritrade.  Yes.  He just never registered as a day
20 trader, so those losses can't be accounted for in tax returns.
21        THE COURT:  Thank you.
22        MS. DOUENAT:  And he doesn't have a ranch.  He
23 doesn't have a condo.  And he doesn't have a Corvette anymore.
24 He doesn't have any of those things.
25        THE COURT:  Mr. Badgett, would you like to say

1  anything?
2          THE DEFENDANT:  Certainly.  I certainly made a
3  mistake in not filing in '10, '11, and '12, and I don't know
4  if the -- we need to state the numbers of what the losses
5  were, but there were very substantial losses and I certainly
6  didn't maliciously not file.  I honestly, the amount of losses
7  in day trading was significant in those years, and I certainly
8  am working now and would like to continue working and support
9  and co-parent my 15-year-old and moving forward.
10         THE COURT:  Anything from the government?
11         MR. BUTLER:  Just briefly, your Honor.
12         As the Court has read the sentencing memorandum and
13 the supplement, I'm not going to repeat what was said there,
14 but during the time period in question Mr. Badgett had
15 personal expenses from this income of $14 million.  He had a
16 tax liability of about $5.3 million that was owed at that
17 time.  He just said a moment ago he did not maliciously
18 fail -- or fail to file, but as you see in the Presentence
19 Report, your Honor, as well as in the sentencing memorandum
20 for the government, he approached a CPA.
21         The CPA told him he had to file his taxes to get
22 up-to-date.  He had to file the reports for the foreign bank
23 accounts.  He chose not to do so, and he cut off contact with
24 the CPA.  His own sister had prepared returns for him for that
25 time period, which he did not file.  So it is clearly a

1  situation where he knew he was required to file, he failed to
2  file, he chose to fail to file, and, you know, the -- so, you
3  know, he was living a lavish lifestyle and he enjoyed that
4  lavish lifestyle, and he had perhaps the right to live that
5  lavish lifestyle, but he also had the responsibility to file
6  his tax returns.
7          To impose a probationary sentence as requested by
8  defense counsel in this case would show no respect whatsoever
9  for the tax laws in this country, especially on a case like
10 this involving over $5.3 million in tax loss to the IRS.
11         I cited for the Court some other cases in the
12 sentencing memorandum where the dollar amounts were much, much
13 lower than this and the individuals were receiving sentences
14 of significant periods of incarceration.  We have asked for a
15 sentence in this case of 27 months.  We would ask that the
16 Court impose that sentence of 27 months, as long as well as
17 the other conditions of the sentence in this case, and to
18 impose the restitution of the tax loss in this case, the
19 $5.3 million, plus the accrued interest in this case, which is
20 tremendous as well, which is about $1,136,027.76.
21         So the total there is 6,527,491.76.  It's a
22 tremendous amount of money and a probationary sentence in this
23 case, as I said, would show no respect for the tax laws or the
24 responsibility of everybody else who does comply with them to
25 comply with those tax laws.

1        MS. DOUENAT:  Your Honor, may I briefly respond?
2        THE COURT:  Yes.
3        MS. DOUENAT:  So the loss amount during that time is
4   $12.2 million.  So, yes, he made a lot of money, and he lost a
5   lot of money.  And, yes, during a little bit of a period of
6   time he may have had a lavish lifestyle.  That didn't last
7   more than a year and a half, your Honor.  And everything he
8   lavishly spent and bought, he lost.
9        Yes, it wasn't right.  It wasn't smart.  But the
10  stuff that's different here than any other case is what he
11  did.  In 2014 he cooperated with SIGAR.  He cooperated with
12  the IRS.  He did everything they wanted.  He testified before
13  a grand jury, secured an Indictment.  Yes, there is no arrest
14  yet, but that's because it just happened in November, and that
15  is substantial assistance.  And, yes, granted the government
16  only asked for a nine-month reduction of sentence, but that's
17  absurd.  The Court under Rodriguez can give a more extensive
18  downward departure based on his cooperation.
19       And so this is not just a man who disregarded the
20  laws of the United States.  Yes, during that period he wasn't
21  filing for his taxes because he couldn't qualify as a day
22  trader so he was overwhelmed with the magnitude of the amount
23  he had to pay the IRS when he didn't have it, but he didn't
24  shy away from meeting with agents, and cooperating, and doing
25  what the right thing was, which is substantial assistance and

1  trying to make things right.
2          He doesn't even own a home.  He owns a Jeep, lives
3  with his girlfriend, and works as a chef.  He doesn't even
4  have a substantial IRA or a retirement account, and he's 47
5  and has three children.
6          THE COURT:  You still need to address, though, his
7  tax advisors are telling him he needs to file a return, he
8  doesn't file a return, and then he doesn't seek any assistance
9  in trying to get liability either reduced, mitigated, or
10 delayed in payments.
11         MS. DOUENAT:  He was cooperating during that period
12 with the government.  He didn't know what was going to happen
13 with -- I mean, since 2014 he's been cooperating with the
14 government.  So the last three years, that's what he's been
15 doing.
16         We were appointed in 2015.  We came up with a
17 resolution in 2017.  An Indictment was filed.  He pled to it.
18 He followed to the "T" the Indictment, filed his taxes.  After
19 the IRS agents, after he hired an accountant, and gave all the
20 paperwork, and then the IRS agent reviewed before filing those
21 tax returns, and then they were filed.  All of that was done.
22         THE COURT:  Thank you.
23         Mr. Badgett, I've reviewed your Presentence Report.
24 I adopt the report.  I've reviewed the 3553(a) factors.  I've
25 reviewed the government's motion.  That motion is granted.

1  I've reviewed the government's memorandum in aid of
2  sentencing.  I've reviewed your lawyer's sentencing
3  memorandum.
4           MS. DOUENAT:  And, your Honor, just one more thing.
5           There is an alternate to incarceration, and that is,
6  and it's been done in another case if the Court wants some
7  guidance on that, and that is placing Mr. Badgett in a halfway
8  house so he can be paying back in lieu of incarceration and
9  running the sentences concurrent on the three counts and
10 having that period be in a halfway house, whether it's six
11 months, or seven months, or whatever the Court is wanting to
12 do.
13          And I'm just saying, I mean, the key here is pay
14 back.  And being incarcerated, he's not going to be paying
15 back child support, so that's going to accrue.  He's not going
16 to be paying the government back, and that's going to accrue.
17 There are other avenues the Court can, if the Court wants to
18 give him some prison time, that halfway house, he would go to
19 work and come back at night, so...
20          THE COURT:  And so you anticipated what I was going
21 to do here.  I wasn't thinking of halfway house.  That's a
22 good idea.
23          All factors considered, I take into account the level
24 of cooperation you've been providing, and then looking at the
25 3553(a) factors, I'm not sure how anybody is going to be, your

wife or children, or the government for that matter is going to be benefited by just incarcerating you, and so that's just going to run you deeper into debt.

All factors considered, I sentence you to four months on each of the counts for 12 months total. The entire 12 months is to be served at a halfway house.

MS. DOUENAT: Could this be, your Honor, in Florida, where he is employed, so he can keep that employment?

THE COURT: So we'll make that first attempt. If not, I mean, I'm not going to wait for a bed for an indefinite period of time. So if a bed doesn't open up immediately out there, then he's going to be placed in a bed as soon as possible. So you can work with the probation office on that. I'll allow some lenient time to start that period running, but he will be released from the halfway house only for the purposes of work and for no other -- and medical, and for no other reasons.

Thereafter, you'll be placed on supervised release for three years, after the 12 months of halfway house and confinement is completed.

While on three years of supervised release, you'll comply with the mandatory and standard conditions adopted by the court November 2016.

The Court finds that you do not have the ability to pay a fine and restitution, so a fine will not be imposed.

```
 1              It's ordered that you pay the United States
 2   restitution in the amount of $5,391,464 to be ordered as a
 3   special condition of supervised release.
 4              You are ordered to pay a special assessment of $25
 5   for each of the three counts for a total of $75.
 6              You have the right to appeal the sentence imposed in
 7   this case unless as part of the plea agreement you have waived
 8   that right.
 9              Anything further from the government?
10              MR. BUTLER:  Yes, your Honor.  I would just ask in
11   terms of restitution, would that include, as well, any accrued
12   interest in this case?
13              THE COURT:  So it will be -- yes -- the underlying
14   amount and accrued interest.
15              MR. BUTLER:  Thank you, your Honor.
16              THE COURT:  Anything else?
17              MR. BUTLER:  Nothing further.
18              THE COURT:  Anything else, Miss Douenat?
19              MS. DOUENAT:  You mentioned the lenient time, I just
20   wanted to know --
21              THE COURT:  Up to 60 days, I'll let him --
22              MS. DOUENAT:  Two months?
23              THE COURT:  -- yeah -- stay out for at least 60 days.
24              Needless to say, if you screw up in the next 60 days,
25   I'll just pick you up.  Do you understand?
```

```
 1              THE DEFENDANT:  Yes, sir.
 2              THE COURT:  Anything else?
 3              MS. DOUENAT:  So I'm going to be working with
 4  probation here to find a halfway house in Florida that in the
 5  60 days he could report to then?
 6              THE COURT:  Correct --
 7              MS. DOUENAT:  Thank you.
 8              THE COURT:  -- and if they don't have a room within
 9  60 days, he gets put in a facility here.
10              MS. DOUENAT:  Okay.  Your Honor.
11              THE COURT:  Clear?
12              MR. BUTLER:  Thank you, your Honor.
13         (Concludes proceedings.)
14                             -oOo-
15     I certify that the foregoing is a correct transcript from
16  the record of proceedings in the above-entitled matter.  I
17  further certify that the transcript fees and format comply
18  with those prescribed by the Court and the Judicial Conference
19  of the United States.
20
21  Date:  1/11/2018           /s/  Gigi Simcox
                                United States Court Reporter
22                              655 East Cesar E. Chavez Blvd.
                                San Antonio, TX 78206
23                              Telephone:  (210) 244-5037
24
25
```